IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ROSIE JEANNETTE MENDEZ, and SARAH JEAN RENDON <br><br> Defendants. | Case No. 5:22-cr-40091-HLT |

**MEMORANDUM AND ORDER**

A state trooper recovered roughly 70 pounds of methamphetamine and 28 pounds of fentanyl after a routine traffic stop on I-70. A grand jury indicted Defendants Rosie Mendez and Sarah Rendon (the occupants of the vehicle) for possession with intent to distribute a controlled substance. They move to suppress the drugs and argue that the state trooper violated their Fourth Amendment rights by unlawfully extending the stop when he reapproached their vehicle to obtain Rendon's license and ask more questions. Docs. 36, 37. Rendon additionally argues that the state trooper violated her rights by not giving her a meaningful opportunity to object to the search. The Court denies the motions because the state trooper's reapproach did not run afoul of the Fourth Amendment (i.e., the reapproach was part of the mission of the stop and, alternatively, the state trooper had reasonable suspicion at that time) and because Mendez's consent as the vehicle's driver was sufficient.

I.    BACKGROUND[1]

A.    **Trooper Goheen's Training and Experience.**

Trooper Jerrad Goheen is a Lieutenant with the Kansas Highway Patrol ("KHP") and has 23 years of experience. He started his career with the KHP in 2001. His initial training included 22.5 weeks at the KHP training academy where he learned about traffic laws and traffic accident investigation. Trooper Goheen served as a road trooper until 2004 and then joined the K-9 narcotics unit from 2004-2007. In the K-9 unit he trained and worked with dogs for narcotics detection. He attended over 20 weeks of training and received team certification with his dogs. He also learned about different types of illegal substances and concealment methods. From 2007-2009, he again worked as a road trooper. In 2009, Trooper Goheen joined Troop N, which is a domestic highway enforcement unit tasked with criminal interdiction. Trooper Goheen supervises Troop N's team in the west region of Kansas. He also still regularly patrols Kansas highways, performing traffic enforcement and accident investigations. He has conducted thousands of traffic stops and been involved in hundreds of stops that resulted in drug-related investigations. He also conducts interviews.

Trooper Goheen has extensive training and experience in criminal interdiction. He has taught both basic and advanced interdiction courses for new recruits and has done so for several years. He takes online courses about updated interdiction training and techniques. He has attended the Drug Interdiction Assistance Program conference at least twice and the Desert Snow

---

[1] The Court held an evidentiary hearing and oral argument on February 2, 2024. The Court received Government Exhibits 1-3 and Defense Exhibits B-J as well as the testimony of Kansas Highway Patrol Trooper Jerrad Goheen and Federal Public Defender Investigator Fransila Blanco-Munoz. The Court credits the testimony of both witnesses after observing them in the courtroom. Both witnesses thoughtfully answered questions, made sure to correct or clarify points, and maintained eye contract throughout questioning. The Court additionally credits Trooper Goheen's testimony because he testified consistently for about two hours and his testimony was consistent with other record evidence (i.e., the video).

2

conference, which is a drug interdiction conference that consists of an additional 40 hours of training.

### B.     The Traffic Stop on July 6, 2022.

Trooper Goheen was patrolling a section of I-70 on July 6, 2022. He was in a Dodge Challenger and was wearing battle dress uniform (i.e., cargo pants, shirt, and a body armor vest identifying him as law enforcement). He was armed with a firearm and a taser. He was about 200 miles east of the Kansas-Colorado border. Trooper Goheen was driving westbound and saw three vehicles driving closely together in the eastbound lane—an uninvolved vehicle in front, followed by a Mitsubishi, and then a Volkswagen. He observed the Mitsubishi commit a traffic infraction for following too closely to the front vehicle. Trooper Goheen turned around and caught up to the Mitsubishi.

The Volkswagen remained behind the Mitsubishi in the right lane as Trooper Goheen approached in the left lane. He noticed that the Mitsubishi and the Volkswagen both had California license plates. He believed they might be traveling together, so he ran the Volkswagen's license plate through the license plate reader ("LPR") system as a safety precaution. Trooper Goheen then pulled beside the Mitsubishi to do a safety check to identify the number of occupants and check for seatbelt usage.

Trooper Goheen then dropped back because he intended to move into the right lane behind the Mitsubishi to initiate a traffic stop. But as he slowed down, the Volkswagen sped up and pulled closer to the Mitsubishi. Trooper Goheen thought, based on his training and experience, that the Volkswagen was attempting to "close the gap" so that he could not pull behind the Mitsubishi. The Volkswagen still did not yield to his patrol vehicle when Trooper Goheen activated his lights. Trooper Goheen eventually pulled in behind the Mitsubishi, and the Volkswagen continued to

3

follow him even as his vehicle and the Mitsubishi slowed down. The Volkswagen then quickly moved around his vehicle and sped off. The Mitsubishi stopped on the side of I-70.

Trooper Goheen thought that the Mitsubishi and Volkswagen were traveling together because of their proximity and their California plates. He initially thought they might be family traveling together. But Trooper Goheen then thought that the Volkswagen was an escort vehicle because it tried to close the gap, tried to prevent him initiating the stop on the Mitsubishi, and abruptly sped off and continued driving. From his training and experience, he knew this was inconsistent behavior for families traveling together or other innocent caravans. He also knew that drug traffickers use escort vehicles to distract law enforcement and disrupt attempts to stop vehicles containing contraband. He had encountered escort vehicles before.

Trooper Goheen exited his vehicle and approached the Mitsubishi. He immediately observed unusual behavior. Mendez (the driver) was animated, laughing, talking loudly, and acting in an overly friendly manner. Both occupants had freshly lit cigarettes even though he did not see other cigarette butts in the vehicle. Trooper Goheen told Mendez that he was not going to write her a ticket. He testified that he told her this information to try and ease her nervousness and see whether her behavior changed. But Mendez's behavior did not change. She still talked loudly and waved her arms. And the passenger, who he later learned was Rendon, offered more information than necessary in answering his questions.

Trooper Goheen asked about their travel plans. Mendez and Rendon told Trooper Goheen they were headed to Topeka for Rendon's niece's wedding that weekend—a few days away—but that festivities were beginning before then. Rendon offered that she was doing the flowers at the wedding and that the plans had changed five times. Trooper Goheen did not observe any floral supplies in the vehicle. They told him they were driving a rental vehicle under Rendon's name and

4

were not family. Trooper Goheen obtained Mendez's driver's license and the rental agreement. Mendez had a Florida driver's license.

Trooper Goheen observed a Santa Muerte statue on the vehicle's console by the cupholders while he was talking with Defendants. Trooper Goheen knew from his training and experience that Santa Muerte iconography is associated with drug trafficking and that drug traffickers pray to Santa Muerte for guidance and safety. Trooper Goheen has encountered Santa Muerte iconography in vehicles in previous drug trafficking stops. He has observed the Santa Muerte statue at least ten times in traffic stops involving drug activity. He has been told during interviews that Santa Muerte is related to drug cartels. He has never stopped a vehicle with innocent travelers that had a Santa Muerte statue in the vehicle. And he has learned about the relationship between Santa Muerte and drug trafficking from his training online and at conferences.

Trooper Goheen returned to his vehicle. He sent a text message to another trooper about the Volkswagen. He ran Mendez's license and asked dispatch to check her criminal history. He then ran the Mitsubishi's license plate through the LPR system while he waited for the return from dispatch (he had run the Volkswagen through the LPR system before initiating the stop). He learned that the Mitsubishi and the Volkswagen crossed the Colorado-Kansas border within 13 seconds of each other. This added to his belief that the Volkswagen was an escort vehicle because it would be rare for two unrelated vehicles to remain within seconds of each other 200 miles down the road.

Trooper Goheen also reviewed the rental agreement while he waited for dispatch. He learned from the rental agreement that Rendon rented the Mitsubishi on June 29 in San Diego and was to return it in San Diego on July 6, 2022 (the day of the stop).[2] His suspicions grew because

---

[2] There was some quibbling about when Trooper Goheen learned that the rental vehicle was to be returned to San Diego. The Court finds that he learned from the rental agreement that the Mitsubishi was to be returned to San

5

the travel plans did not make sense. Mendez had a Florida driver's license. She was driving a vehicle that was rented in California (and was to be returned to California) to attend a wedding in Kansas. The rental vehicle was due back in California that day even though the wedding was a few days away. It did not make sense to him that Defendants would drive back to California simply to return a vehicle. And he knew from his training and experience that it is common in drug trafficking to see an individual fly from one location and then drive to another location.

Dispatch radioed back and told Trooper Goheen that Mendez had a valid license and did not have any prior drug arrests. He then exited his vehicle and reapproached the Mitsubishi to obtain Rendon's driver's license to confirm she was the person named on the rental agreement. Trooper Goheen believed Defendants were engaged in drug trafficking at the time he reapproached. He asked Rendon for her driver's license. She also had a Florida driver's license. He asked where she rented the vehicle, and Rendon told him San Diego. He asked Rendon if that was where she lived, and she said no but explained that they had been in California on vacation. Trooper Goheen then returned to his vehicle.

Another trooper arrived on scene and got in Trooper Goheen's vehicle. Trooper Goheen ran Rendon's license and asked dispatch to check her criminal history. Trooper Goheen then talked with the other trooper about the situation. Trooper Goheen told the other trooper that: the

---

Diego on July 6, 2022, and that he learned this information before reapproaching the vehicle to obtain Rendon's license. Trooper Goheen consistently testified that he learned this information from reviewing the rental agreement. He testified that he then reapproached the vehicle to confirm the rental information. He further testified that it was concerning that the vehicle was to be retuned in San Diego. He conceded on cross-examination that he assumed the vehicle was going back to San Diego and that he had zero information from anybody in the rental as to where it was being returned before he reapproached the Mitsubishi. But this testimony simply establishes that neither Mendez nor Rendon told him during his initial encounter where the vehicle was to be returned. It says nothing about what he learned from the rental agreement. His testimony is consistent with the video, which shows that neither Rendon nor Mendez told him specifically where the rental vehicle was due back until Trooper Goheen's final conversation with Mendez right before the search. Overall, Trooper Goheen testified several times that he saw on the rental agreement that the vehicle was due back in San Diego on July 6, 2022, before reapproaching the Mitsubishi. The Court credits his testimony.

Volkswagen crept up on him like it didn't want him to get between the Mitsubishi and the Volkswagen, they rented the vehicle out of San Diego, they lived in Florida, they claimed they were going to Topeka for a wedding, they were extremely nervous and both lit a cigarette (he later said "they are both lighting cigarettes like you would not believe"), and there were a bunch of suitcases in the back. Dispatch then radioed that Rendon's license was valid and she had no prior drug arrests. Trooper Goheen continued to talk with the other trooper about the rental vehicle and Defendants' unusual travel plans. He noted that the Volkswagen and the Mitsubishi crossed the border at the same time and that they were not family traveling together. Trooper Goheen prepared the written warning while talking with the other trooper. He exited the vehicle to give the warning to Mendez immediately after it printed.

Trooper Goheen asked Mendez to exit the Mitsubishi and speak with him outside. She followed him to the rear of the Mitsubishi. He returned the two licenses and the rental agreement and explained the written warning. Mendez's behavior was still overly friendly—she asked for his name, laughed, shook his hand twice, and said she was going to display the written warning on her wall. Trooper Goheen told Mendez to have a safe trip, and Mendez turned to walk back to the Mitsubishi.

After Mendez turned away, Trooper Goheen asked if he could "ask [her] a question real quick."[3] Ex. 1 at 14:14. Mendez turned and came back to speak to Trooper Goheen. He asked a

---

[3] Mendez argues that she did not willingly consent to the conversation with Trooper Goheen after he returned her papers and told her to "have a safe trip." Mendez asserts this additional questioning is an unlawful detention that led to an illegal search. The Court need not resolve whether the final conversation between Mendez and Trooper Goheen was consensual because Trooper Goheen continued to have reasonable suspicion of criminal activity that justified further questioning. He had reasonable suspicion of criminal activity when he reapproached to obtain Rendon's license as explained below. His reasonable suspicion did not dissipate between his reapproach and the return of her papers. It instead grew as he learned more about their travel plans and as Mendez's unusual behavior continued at the rear of the vehicle while he was explaining the warning (e.g., thanking him, shaking his hand twice, laughing, etc.). *See United States v. Ozbirn*, 189 F.3d 1194, 1199 (10th Cir. 1999) ("[An] officer [may] engage in further questioning unrelated to the initial stop if he has . . . reasonable suspicion of criminal activity.").

few clarifying questions about their travel plans. Mendez told him that they flew to California and were on vacation. Trooper Goheen asked a few questions about her vacation. Mendez looked at her phone to answer when she got to California. Trooper Goheen asked about Rendon. Mendez told him that Rendon was like her sister but way older. He asked her about the wedding, and Mendez told him they were going to Rendon's sister's wedding—before, Rendon had said it was her niece's wedding—and then explained she did not know whose wedding it was and he should ask Rendon. Mendez also said they were driving back to San Diego after the wedding just to return the rental vehicle. She then agreed with him that it is a lot of driving and told him that she gets stuck driving even though she did not want to drive. Trooper Goheen asked about her work, and she told him that she was a nail tech and showed him pictures on her phone of nails she has done even though he told her he did not need to see pictures. Trooper Goheen testified that this was unusual and that he can't remember any person ever on a normal traffic stop wanting to show him pictures on a phone.

Trooper Goheen testified that he continued to believe they were engaged in criminal activity. He asked her if they brought anything illegal from California, and she said no. Trooper Goheen asked if he could search the rental vehicle, and Mendez said "yeah, go ahead" without hesitation and stepped aside so he could approach the vehicle. Ex. 1 at 16:43. He asked her to go to the front of the vehicle. Trooper Goheen testified that he believed Mendez had authority to consent to a search of the vehicle because she was the driver. He also testified that a K-9 unit was on-site at this point and that he intended to have the unit sniff the vehicle if Mendez refused consent.

Trooper Goheen then went to the passenger side of the vehicle and asked Rendon to exit. He asked her to step to the front of the vehicle and told her that he was going to search the vehicle.

8

He asked if the vehicle contained anything illegal, and she said a JUUL vape pen. Ex. 1 at 17:20. Trooper Goheen testified that he assumed it contained THC because she identified it in response to a question about illegal items and tobacco cartridges are legal whereas marijuana is illegal in Kansas. Rendon did not object to him searching the vehicle or ask any questions. She then went to the front of the vehicle and stood by Mendez. A trooper was at the front of the vehicle with them.

Trooper Goheen walked to the rear of the vehicle. He and another trooper began searching. He mentioned Defendants' nervousness and travel plans to the other trooper. Trooper Goheen noticed that one of the rear quarter panels had been pulled out. He knew from his training and experience that quarter panels are natural voids to hide packages. Trooper Goheen opened the quarter panel and found white packages. He and the other trooper walked to the front of the vehicle and arrested Mendez and Rendon. Ultimately, officers recovered 84 packages from the Mitsubishi. These packages contained 71 pounds of methamphetamine and 28 pounds of fentanyl.

## II.   ANALYSIS

Defendants move to suppress the drugs found in the vehicle because Trooper Goheen unlawfully extended the stop when he reapproached to obtain Rendon's license and ask additional questions. Defendants contend these actions were not part of the mission of the stop and that Trooper Goheen lacked reasonable suspicion or consent to continue the detention. Defendants contend everything after this moment violates their Fourth Amendment rights and must be suppressed. Rendon additionally argues that Trooper Goheen violated her rights because she was not given a meaningful opportunity to object to the search. The Court addresses each argument below.

### A. Trooper Goheen Did Not Violate the Fourth Amendment by Unlawfully Extending the Stop.

Defendants initially argue that Trooper Goheen violated their Fourth Amendment rights by unlawfully extending the stop. They argue reasonable suspicion of criminal activity was needed when Trooper Goheen reapproached their vehicle to obtain Rendon's license and ask additional questions. Defendants argue these actions were not related to the mission of the stop, and Trooper Goheen lacked reasonable suspicion to detain them.

The Fourth Amendment guarantees the right of people to be "secure in their persons, houses, papers, and effects[ ] against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. A traffic stop is subject to the reasonableness requirement of the Fourth Amendment because it is a seizure. *United States v. Cortez*, 965 F.3d 827, 833 (10th Cir. 2020). A traffic stop is reasonable if the stop is justified at its inception and if the resulting detention is reasonably related in scope to the mission of the stop. *Id.*; *see also Rodriguez v. United States*, 575 U.S. 348, 355-356 (2015). An officer may detain the occupants after the mission of the stop is completed if the occupants consent or if the officer has "independent reasonable suspicion of criminal wrongdoing . . . that justifies further investigation." *Cortez*, 965 F.3d at 833-34.

Defendants do not challenge the validity of the initial stop. Trooper Goheen testified the stop was based on a traffic infraction: the Mitsubishi was following the vehicle in front of it too closely. Defendants argue instead that Trooper Goheen unlawfully extended the stop when he reapproached the vehicle. Defendants argue that getting Rendon's license and asking additional questions about their travel plans were not reasonably related to the mission of the stop.

#### 1. Trooper Goheen's reapproach and additional questions were within the mission of the stop.

Trooper Goheen's reapproach and additional questions were within the mission of the stop. Trooper Goheen initiated the traffic stop because Mendez was following the vehicle in front of her

10

too closely. Trooper Goheen initially approached Defendants' vehicle, told Defendants he intended to issue Mendez a warning, collected Mendez's license and the rental agreement, asked a few questions about their travel plans, and returned to his own vehicle. Trooper Goheen then ran a check of Mendez's license and criminal history. Trooper Goheen also ran the Mitsubishi's license plate through the LPR system, sent a text message(s) to another trooper(s) about the Volkswagen, and reviewed the rental agreement. Defendants do not challenge these actions and concede they are part of the mission of the stop.

Trooper Goheen then reapproached the vehicle to request Rendon's license so that he could confirm that she was the person named on the rental agreement and to ask a few questions about their travel plans. Defendants contend these actions exceeded the scope of the mission of the stop. The Court disagrees.

"A traffic stop may 'last no longer than is necessary' to complete the mission of the stop." *Cortez*, 965 F.3d at 837 (quoting *Rodriguez*, 575 U.S. at 354). The mission of the stop typically includes addressing the traffic violation that warranted the stop and attending to related safety concerns. *Id.* The Tenth Circuit has explained that:

> Our precedents establish that, in the context of an ordinary traffic stop, law enforcement may engage in certain inquiries without running afoul of the Fourth Amendment. For example, an officer may perform those activities necessary to completing the citation such as requesting a driver's license and registration, running requisite computer checks, and issuing citations or warnings. An officer may also inquire about the driver's travel plans and the identity of the individuals in the vehicle.
>
> In addition, because traffic stops are especially fraught with danger to police officers, law enforcement personnel may take certain negligibly burdensome precautions in order to complete their mission safely. These may include conducting criminal record checks, searching for outstanding warrants, or asking limited questions directed at ensuring officer safety.

> What law enforcement may not do is divert from the mission of the stop in order to conduct general criminal interdiction or investigate other crimes.

*Id.* at 838 (cleaned up and internal quotations and citations omitted). The Tenth Circuit has held that attendant safety concerns permit officers to request identification from passengers and run background checks on them. *United States v. Reynolds*, 729 F. App'x 639, 643 (10th Cir. 2018) (observing that requesting passenger identification and conducting passenger-related background checks are reasonable precautions to protect officer safety). And, more recently, the Tenth Circuit recognized that the mission of a stop includes "detaining [the defendant] for the purpose of determining whether he was authorized to drive his rental car by rental agreement." *United States v. Dawson*, 90 F.4th 1286, 1292 (10th Cir. 2024).

The Court finds that Trooper Goheen did not depart from the mission of the stop when he reapproached to obtain Rendon's license. Trooper Goheen credibly testified that he asked for Rendon's license so he could confirm that she was the person named in the rental agreement and had authority to possess the vehicle. This situation is the inverse of *Dawson*,[4] but *Dawson*'s rationale still applies with equal force:

> [R]egistration requirements are essential elements of state roadway safety programs that, in conjunction with licensing requirements, ensure only those qualified to do so are permitted to operate motor vehicles. A rental agreement check is . . . closely tied to traffic enforcement and is properly characterized as part of an officer's traffic mission when he conducts a stop on a rental vehicle.

*Id.* at 1292 (internal quotation and citations omitted).

The Court also finds that Trooper Goheen did not depart from the mission of the stop when he asked additional questions about Defendants' travel plans. Officers are usually entitled to

---

[4] *Dawson* involved a defendant who remained detained after he had been issued a speeding citation while the police waited for him to produce a copy of his vehicle's rental agreement. 90 F.4th at 1288-89. Drugs were found in plain view in the vehicle while the defendant waited for the agreement. *Id.* at 1289-90.

inquire about a motorist's travel plans as part of the mission of the stop. *Cortez*, 965 F.3d at 839 (finding questions about where the defendants "were coming from, where they were going, and how long they had stayed" in a location were "permissible as they fit into the travel plans rubric and relate to the mission of the stop"); *see also United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000) (explaining that questions about travel plans are routine and may be asked without exceeding the scope of the stop). Trooper Goheen credibly testified that the pair's travel plans did not make sense and that his additional questions merely sought to confirm his understanding of their travel plans. His questions required a negligible amount of time and were reasonable and consistent with the public's expectations regarding ordinary inquiries incidental to traffic stops. Trooper Goheen's reapproach and questions were reasonable and did not violate the Fourth Amendment.[5]

### 2. Trooper Goheen had reasonable suspicion of criminal activity.

The Court alternatively finds that Trooper Goheen had independent reasonable suspicion when he reapproached the vehicle. Reasonable suspicion "accrues when an officer possesses a particularized and objective basis for suspecting criminal conduct under a totality of the circumstances." *Cortez*, 965 F.3d at 834 (internal quotation and citation omitted). The government has the burden to show there was reasonable suspicion, but this standard is not onerous. *Id.* Importantly, "[t]he existence of reasonable suspicion does not require the officer to rule out the possibility of innocent conduct, and in assessing reasonable suspicion [courts] defer to a police officer's training and ability to discern innocent conduct from suspicious behavior." *Id.* Here, the

---

[5] Defendants argue as a backup position that Trooper Goheen extended the scope of the stop by running Rendon's name through a criminal background check when he reentered the patrol vehicle. This argument fails because the background check was justified by officer safety. *Reynolds*, 729 F. App'x at 643. In addition, the Court notes that the background check was conducted while Trooper Goheen was completing the paperwork for the warning. The background check on Rendon did not measurably prolong the stop.

totality of the circumstances before Trooper Goheen's reapproach included numerous facts indicating that Defendants may have been engaged in drug trafficking.

First, the Mitsubishi's proximity to the Volkswagen and the Volkswagen's unusual driving behavior generated suspicion. The Mitsubishi and the Volkswagen were traveling closely together and both vehicles had California licenses plates. The Volkswagen began to drive in an unusual manner after Trooper Goheen caught up to the vehicles. It crept up on him when he slowed down to get behind the Mitsubishi, blocked him from changing lanes, and did not yield to him after his lights were activated. The Volkswagen slowed down with the Mitsubishi and Trooper Goheen before it abruptly changed lanes and sped off. In addition, the vehicles crossed the Colorado/Kansas border within 13 seconds of each other and remained in close proximity 200 miles later. There may have been an innocent explanation for the continued proximity of two vehicles with California plates (e.g., families caravanning together). But Trooper Goheen's training and experience suggested that an innocent explanation was unlikely given the Volkswagen's driving pattern and behavior once he caught up to the vehicles. He instead believed based on his training and experience and these articulable facts that the Mitsubishi and the Volkswagen were traveling together and acting in concert in a manner consistent with drug trafficking. *See United States v. Berg*, 956 F.3d 1213, 1215-16, 1218 (10th Cir. 2020) (crediting an officer's suspicions of drug trafficking where the behavior of three out-of-state vehicles traveling in close proximity suggested two of the vehicles were escorting this third). These facts contribute to the reasonableness of suspecting Defendants of trafficking.

Second, Defendants' extreme nervousness generated suspicion. Trooper Goheen approached the vehicle and immediately noticed unusual behavior. He told Defendants he would be issuing a warning to alleviate nervousness. But Defendants continued to act extremely nervous

14

as demonstrated by their physical manifestations. Mendez talked loudly, appeared overly friendly, moved her arms in an animated fashion, and laughed. Rendon volunteered unnecessary information about the wedding and flower arrangements. And both were smoking freshly lit cigarettes even though Trooper Goheen did not see other cigarette butts in the vehicle. The Court realizes that the Tenth Circuit has consistently held that ordinary nervousness bears little weight whereas extreme and persistent nervousness gets some weight. *See, e.g.*, *United States v. Kitchell*, 653 F.3d 1206, 1220 (10th Cir. 2011). Here, Trooper Goheen testified that Defendants appeared extremely nervous to him based on his training and years of experience and that their nervousness did not subside when he told them he was only issuing a warning. The Court credits this testimony and agrees that Mendez's observable behavior from the video appears unusually bubbly and overly friendly for a person traveling out-of-state who has been pulled over by a highway patrol trooper. But the Court affords little weight to this fact overall because Trooper Goheen had no baseline knowledge about Defendants' ordinary communication styles or behaviors. And Trooper Goheen's initial interaction with Defendants was relatively short. Thus, the Court finds that Defendants' extreme nervousness reasonably but marginally contributes to suspecting Defendants of drug trafficking.

Third, the Santa Muerte statue on the front console generated suspicion. Trooper Goheen testified that based on his training and experience Santa Muerte is iconography that drug traffickers pray to for protection. He testified that he has seen the Santa Muerte statue at least ten times in traffic stops involving drug activity but has not seen Santa Muerte in a vehicle with innocent travelers. He testified that he has learned during interviews that Santa Muerte is related to drug cartels. And he testified that training he received online and at conferences has identified Santa Muerte as being associated with drug trafficking. The Court recognizes that Santa Muerte may

15

have other religious significance to different people and its presence may be capable of innocent explanation.[6] But Trooper Goheen credibly testified that he found the statue suspicious based on his training and years of experience with the Kansas Highway Patrol. The Court credits this testimony and finds that the presence of the Santa Muerte statue contributed to the reasonableness of suspecting Defendants of drug trafficking. *See United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009) (noting that Santa Muerte figure in a stopped vehicle contributed to an officer's reasonable suspicion of criminal activity); *United States v. Samaniego-Villa*, 2019 WL 1367401, at *12 (D.N.M. 2019) (same); *United States v. Felix*, 2013 WL 474542, at *6 (D. Utah 2013) (explaining that Santa Muerte pendant supported officer's reasonable suspicion that the defendant had been involved in criminal activity).

Fourth, the rental agreement and travel plans generated suspicion. The rental agreement showed that Rendon had rented the Mitsubishi in San Diego on June 29 and that the vehicle was due back in San Diego on July 6 (the day of the stop). Mendez had a Florida driver's license and told Trooper Goheen that Defendants were driving from California to Kansas for a wedding that weekend. Rendon volunteered that she was doing the flowers at her niece's wedding, but Trooper Goheen did not observe any corresponding supplies in the vehicle. Some of these facts in isolation seem innocent (e.g., traveling from California to Topeka for a wedding, a Florida resident driving a vehicle rented in California). But the totality of these facts renders the travel plans logistically unrealistic and implausible—namely, two women from Florida are driving from California to Kansas for a wedding that is still days away in a vehicle rented a week earlier in San Diego and

---

[6] Blanco-Munoz testified that Santa Muerte is a devotional religious being with corollaries in many cultures. She testified about her investigation into the availability of Santa Muerte iconography for this case. She found the statues of Santa Muerte available for purchase online or in commercial establishments in Topeka. The Court credits her testimony but finds that it does not undermine Trooper Goheen's suspicion or undercut his training and experience with Santa Muerte iconography in drug-trafficking settings. The weight of Blanco-Muonoz's testimony is also reduced given that her investigation occurred in January 2024.

that is due back in San Diego that day. These travel plans contribute to the reasonableness of suspecting Defendants of drug trafficking. *Cf. United States v. Leon*, 80 F.4th 1160, 1165-66 (10th Cir. 2023) (noting that plans that are not merely "unusual" but implausible and logistically unrealistic can contribute to an officer's reasonable suspicion of criminal activity).

Overall, these circumstances established reasonable suspicion that Defendants were transporting drugs. The Court gives significant weight to Trooper Goheen's training and experience about the driving patterns of the Mitsubishi and the Volkswagen and the Santa Muerte statue on the front console. The Court concludes that Trooper Goheen possessed sufficient justification based on the totality of the circumstances to detain Defendants to further investigate his suspicions of drug trafficking when he reapproached their vehicle.

The Court finds that Trooper Goheen did not violate the Fourth Amendment when he reapproached the vehicle. The Court additionally finds that his reasonable suspicion remained intact (if not enhanced) after his reapproach, during his discussion with Mendez when returning her papers, and at the time she gave consent to search. The Court thus denies Mendez's motion (in which Rendon joined).[7]

### B. Rendon's Individual Consent Was Not Required.

Rendon additionally argues in her separate motion that Trooper Goheen violated her Fourth Amendment rights because he did not give her a meaningful opportunity to object to the search of

---

[7] Mendez concedes that her consent to search the vehicle was voluntary so long as she was lawfully detained when it was given. The Court finds that Trooper Goheen had reasonable suspicion to detain Defendants while he asked additional questions after returning her papers. This is based on all the information discussed above and is bolstered by the additional information he learned while talking with Defendants before returning their papers (e.g., confirming the return of the vehicle in California, the continuing nervousness, Mendez's overly friendly and animated behavior, etc.). The Court thus concludes that Mendez voluntarily consented to the search of the vehicle. Because the Court concludes that Defendants were lawfully detained when Mendez consented, it does not concern itself with whether Mendez's consent would have been sufficient to "purge the taint" of an unlawful detention. *See United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) ("A person who is being detained may still give voluntary consent, but if the detention is illegal, the government must prove that the primary taint has been purged and that the consent was in fact voluntary." (internal citation omitted))

the vehicle. Rendon does not dispute that Mendez voluntarily consented. Rendon also concedes that Mendez (as the driver) <u>could</u> validly consent to the search even if she did not appear on the rental paperwork. *See United States v. Hunter*, 663 F.3d 1136, 1144-45 (10th Cir. 2011); *United States v. Morales*, 861 F.2d 396, 399-400 (3d Cir. 1988) (finding that permission to drive also gave the driver the authority to consent to a search and that the renter's lack of objection during the search implied consent, even where the renter was unaware of the driver's consent).

Rendon instead argues that Mendez's consent was constitutionally infirm because Rendon was the vehicle's renter, was unaware that Mendez had consented, and was not given a chance to object. Rendon relies on *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006), to argue that "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." Rendon contends that she was never given the chance to object to the search because she did not know Mendez had consented. But Rendon does not cite any authority that would suggest Trooper Goheen was obligated to inform Rendon of Mendez's consent and provide her the chance to object. Moreover, in *Georgia*, the Supreme Court expressly noted that the holding in that case was finely drawn. Although officers must take into account the express refusal of a co-occupant, the Supreme Court did not go so far as to require "the police to take affirmative steps to find a potentially objecting co-tenant before acting on the permission they had already received." *Id.* at 122. Further, Trooper Goheen did tell Rendon about the search, even if he did not tell her Mendez consented to it. Rendon did not object. And some of the cases Rendon relies on suggest that her presence for the search and her silence were enough for Mendez's consent to have been valid. *See, e.g.*, *United States v. Cox*, 992 F.3d 706, 711 (8th Cir. 2021) (finding a driver's consent to the search of a rental vehicle was valid even though done

outside the presence of a co-renter passenger because the passenger did not object when informed of the search).

Rendon relatedly (or perhaps alternatively) argues that Mendez's consent and the resulting search were invalid because Rendon did not feel free to object. She argues that her silence was coerced. The principal problem with this argument is that it is premised on an incorrect interpretation of the factual record. Rendon points to Trooper Goheen's stature and uniform, the presence of other officers at the scene, and the fact that she was told that the rental vehicle would be searched as evidence that she was coerced into not objecting. But even when taken together these facts do virtually nothing to suggest Rendon was coerced. "[T]he law recognizes an inevitable level of pressure inherent in being the subject of law enforcement scrutiny and assumes that an ordinary person can still exercise a free choice." *United States v. Hernandez-Lizardi*, 530 F. App'x 676, 682 (10th Cir. 2013) (internal quotation and citation omitted). And the Court readily finds based on its review of the record that Trooper Goheen "did not use physical mistreatment, violence, promises, inducements, deception, or trickery" to procure Rendon's silence. *Id.* at 681-82. To the contrary, Trooper Goheen was courteous, respectful, and polite throughout the encounter. At no point did Trooper Goheen become aggressive with Defendants, and nothing in the record suggests that his demeanor was threatening or overbearing. The Court concludes that Rendon's failure to object was not procured by coercion. And Mendez's consent to search the vehicle was valid.[8]

---

[8] The government noted at the hearing that Trooper Goheen would have probable cause to search the vehicle based on Rendon's response about the JUUL vape pen. The Court agrees that Rendon's answer to Trooper Goheen about whether there was anything illegal in the vehicle provided independent probable cause for the search. Probable cause exists if there is a fair probability the vehicle contains contraband or evidence when considering a totality of the circumstances. *United States v. Downs*, 151 F.3d 1301, 1303 (10th Cir. 1998). Before the search began, Trooper Goheen asked Rendon if the vehicle contained anything illegal. Rendon replied that she had a JUUL vape pen. Ex. 1 at 17:20. Trooper Goheen testified that he assumed it contained THC because she identified it in response to a question about illegal items and tobacco cartridges are legal whereas marijuana is illegal in Kansas. The Court finds this to be a reasonable inference on the part of Trooper Goheen. If the JUUL vape pen

### III.  CONCLUSION

The Court carefully considered the arguments and finds that Defendants' Fourth Amendment rights were not violated.

THE COURT THEREFORE ORDERS that Defendants' Motions to Suppress (Doc. 36 and 37) are DENIED.

IT IS SO ORDERED.

Dated: February 28, 2024                    /s/ *Holly L. Teeter*
                                            HOLLY L. TEETER
                                            UNITED STATES DISTRICT JUDGE

---

contained only tobacco, it is unclear why Rendon would identify it (and only it) as something illegal. This answer by Rendon, along with the other facts discussed throughout this order that led Trooper Goheen to believe Mendez and Rendon were involved in drug trafficking, was sufficient to create probable cause that the vehicle contained contraband. *See United States v. Richardson*, 801 F. App'x 157, 158 (4th Cir. 2020) (finding probable cause that a car contained contraband where officer smelled marijuana, driver had glassy eyes, and driver admitted to using a THC vape pen that was still in the car). Thus, Trooper Goheen would have had probable cause to search the vehicle.